UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

Susan Gillings,

        Plaintiff,

                                        Case No. 1: 21-cv-264
                                        Hon. Hala J. Jarbou

v.

Haslett Public Schools and
Steven L. Cook in his individual
and official capacities,

        Defendant.

_____/

| | |
|---|---|
| Michael L.  Pitt (P24429) | Timothy J. Mullins (P28021) |
| Beth Rivers (P33614) | Giarmarco, Mullins & Horton, P.C. |
| Pitt, McGehee, Palmer Bonanni & Rivers, PC | *Attorney for Defendants* |
| Attorneys for Plaintiff | 101 W. Big Beaver Road, 10th Floor |
| 117 West Fourth Street, Suite 200 | Troy, MI 48084-5280 |
| Royal Oak, Michigan 48067 | (248) 457-7020 |
| (248) 398-9800 | tmullins@gmhlaw.com |
| mpitt@pittlawpc.com | |
| brivers@pittlawpc.com | |

_____/

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES
JURY DEMAND**

      Plaintiff Susan Gillings ("Ms. Gillings") brings this action against Haslett Public Schools ("HPS" or "District") and Superintendent Steven L. Cook ("Mr. Cook") in his individual and official capacities based on the following allegations:

**Introduction**

      Ms. Gillings has been subjected to unconscionable harassment and retaliation because of her advocacy for minority students and teacher safety and seeks damages and to enjoin this unlawful activity by the Defendants by bringing this action pursuant 42 U.S.C. §1981 and 42 U.S.C. § 1983.

Ms. Gillings, a white female, was employed as the Associate Superintendent of Haslett Public Schools. The position of Associate Superintendent was a very demanding position requiring an assertive and proactive management style. Ms. Gillings, as a parent of two bi-racial sons, one of whom is now deceased, became a strong advocate for the rights of HPS African American students and other minorities after the George Floyd Incident. This incident ignited worldwide student protests centered on issues of critical race theory, diversity, equity and inclusion, white privilege and awareness of police misconduct. Ms. Gillings' advocacy caused considerable friction with her superior Superintendent Steven L. Cook and at least one member of the Board of Education who suggested that the student protests lacked sincerity and authenticity publicly stating that they were "political" and an "overreaction" to the George Floyd killing. Her advocacy as a parent and school administrator caused the Superintendent and a Member of the Board of Education to subject her to a hostile, demeaning and intimidating work environment.

The need for strong proactive management was needed more than ever in the face of the Covid 19 crisis. Ms. Gillings also strongly advocated for the safety of teachers during the pandemic crisis. Her advocacy for the rights of teachers caused a Member of the Board of Education (Gregory Michaud) to publicly defame her by describing her as "unprofessional." Her advocacy for the rights of teachers in the District caused Superintendent Cook and a Member of the Board of Education to subject her to a retaliatory hostile, demeaning and intimidating work environment.

This hostile, demeaning and intimidating work environment was used by Superintendent Cook to make Ms. Gillings work life so intolerable that she would resign. Mr. Cook unconscionably exploited her vulnerabilities because of the recent death of her son

knowing that she would be unable to withstand his abusive behavior toward her.   Rather than resign, Ms. Gillings secured an approved Family Medical Leave so that she could receive psychiatric treatment in an effort to stabilize her emotions

When Ms. Gillings was cleared to return to work from her medical leave, Superintendent Cook blocked her return to work by using a pretext to place her on a paid administrative leave.  The pretext to deprive Ms. Gillings of her right to return to work was based on the District's alleged desire to "investigate" a workplace incident involving a heated discussion between Ms. Gillings and a grossly insubordinate employee during an event which had occurred 5 months earlier.

The use of the stale complaint from the insubordinate employee constituted a form of gender bias because similarly situated male administrators who used strong language in addressing employee misconduct were not criticized or disciplined.  Ms. Gillings' utilization of psychiatric services caused Defendants to regard her as "broken" and not longer to carry out the demanding duties of Associate Superintendent.

Continuing their discriminatory and retaliatory treatment of Ms. Gillings, the Defendants failed to renew her contract, effectively ending her tenure with the District.

Ms. Gillings brings this action to secure her rightful place as Associate Superintendent of HPS, and that upon her reinstatement to secure a Court Order restraining the District and Mr. Cook from their hostile, demeaning, and intimidating conduct and  compensating her for her losses.

### Jurisdiction, Venue, Exhaustion and Parties

1.     This Court has federal question subject matter jurisdiction over Ms. Gillings' claims under 42 U.S.C. §1981,  42 U.S.C. § 1983 and 29 USC § 2601.

2.      This Court also has supplemental jurisdiction under 28 USC § 1367 to address claims brought under the Elliott-Larsen Civil Rights Act, ("ELCRA") MCL 37.2101 et seq and the Michigan Persons with Disabilities Civil Rights Act,("PDCRA") MCL 37.1101, et seq.

3.      Haslett Public Schools is a school district located in Haslett, Michigan.  This court has personal jurisdiction over HPS.

4.      Steven L.  Cook is the Superintendent of Schools for HPS.  He is sued in his individual and official capacities.  At all times, Mr. Cook was Ms. Gillings' supervisor and had the authority to alter the terms and conditions of her employment.

5.      Venue is proper in the Western District of Michigan because the events giving rise to this cause of action occurred in this district and all parties reside in or operate within this judicial district.

6.      If a valid arbitration agreement governs this dispute, Ms. Gillings is not required to exhaust that remedy before proceeding to court on her claims of retaliatory discharge in violation of her First Amendment Rights and her federally protected right to be free from retaliation because of advocacy for minorities.  *McDonald v City of West Branch*, 466 U.S. 284 (1984).

## Statement of Facts

### Relevant Background about Ms. Gillings

7.      Ms. Gillings, age 50, began her career with Haslett Public Schools in July 2015 as Principal of Haslett Middle School.

8.      HPS student population is 90% white, 5% Hispanic,4% Black, and 1% Asian.

9.      In July 2018, Ms. Gillings was promoted to the position of Associate Superintendent reporting to the HPS Superintendent Steve Cook ("Mr. Cook").

4

10.     Ms. Gillings was continuously employed by HPS until February 16, 2021 when she was constructively discharged from active employment in retaliation for exercising her First Amendment rights, in retaliation for her advocacy on behalf of racial minority students at HPS and in retaliation for her advocacy for teacher safety during the Pandemic.

11.     A review of the 134 pages of Ms. Gillings' HPS personnel file reveals that she always received stellar performance evaluations, that there are no reprimands or other forms of discipline noted and all her two-year Administrator contracts have been renewed. It appears from review of the file that she is held in the highest esteem by her supervisors and co-workers.

12.     In March 2020, HPS discontinued in-person classes because of the Covid-19 pandemic.  The District employed a Hybrid Learning Schedule for the balance of the 2020 school year.

13.     Ms. Gillings is the proud parent of two bi-racial sons. Her status as a parent of two bi-racial children was well known by employees and staff in the District.

14.     On April 1, 2020, Ms. Gillings' youngest bi-racial son passed away because of suicide.

15.     Ms. Gillings took time off because of son's passing. Ms. Gillings was told by Mr. Cook to take "all the time she needed."

16.     Ms. Gillings checked in periodically and returned to work on Monday, April 20, 2020.  Her return to work was both remote and in the office, depending on the daily tasks.

## The George Floyd Incident and Its Aftermath

17.     On Monday May 25, 2020, George Floyd, an unarmed 46-year-old African American male, was brutally murdered by Minneapolis Police Officer Derek Chauvin,

5

assisted by three other Officers. A video of his killing was viewed by millions of people worldwide.

18.     Prior to the George Floyd Incident, Ms. Gillings enjoyed an excellent relationship with Superintendent Cook.

19.     The worldwide broadcast of this police brutality triggered in 60 nations peaceful protests against police brutality, police racism, white privilege, and the lack of police accountability.

20.     In the United States alone, peaceful protests were carried out in more than 2,000 cities. The protests were student centered and they were covered by the media for more than a month after Mr. Floyd's tragic death.

21.     The George Floyd killing, and the subsequent protests, caused many educational institutions and organizations to acknowledge to their constituencies the institutional racism that was a root cause of Mr. Floyd's killing.

22.     Many companies, organizations and educational institutions issued public statements supporting the students' demand that serious steps should be taken to end or reduce the effects of police brutality, police racism, white privilege, and the lack of police accountability.

**The District Botches its Efforts to Show Solidarity with its Students**

23.     On Tuesday May 26th, Ms. Gillings approached Mr. Cook and suggested that the HPS meaningfully communicate with its students about the George Floyd Incident.

24.     Ms. Gillings stated that the need for communication was urgent because the students were not in class and therefore would not be able to freely exchange ideas about the impact of the George Floyd Incident ("GFI").  Ms. Gillings shared with Mr. Cook the stated

6

concerns of other HPS administrators and pointed out to him that neighboring school districts were issuing meaningful statements to its students and their parents.

25.     Mr. Cook was resistant to the idea and stated that this type of communication was "not necessary."  Ms. Gillings argued that a communication would help the students process what was happening worldwide and that she offered to author the first draft of the communication.

26.     On Sunday May 31st, an administrator and teacher from the HPS high school advised Ms. Gillings and Mr. Cook that the neighboring East Lansing Public Schools was sending out a communication to its students about the GFI and how it might affect them. Ms. Gillings reiterated her concern to Mr. Cook that the HPS should send out a similar communication.  Mr. Cook did not appear to be interested.

27.     On Monday, June 1st, Ms. Gillings again talked to Mr. Cook about the HPS sending out a communication about the GFI and its impact on the District students.

28.      On June 2nd, Ms. Gillings and Mr. Cook received an email from Amber Dale, HPS High School Special Education Teacher, and Meghan Ritchey, HPS High School Social Worker, requesting that the District issue a statement promoting anti-racism and support for students of color.

29.     Ms. Gillings approached Mr. Cook for the third time and on this occasion, she spoke to him at length about the need to issue a communication about GFI.  Mr. Cook said that he was "putting something together."

30.     At 4:52 PM, Ms. Gillings received a text from Mr. Cook asking for her thoughts for the communication and that her "input will be helpful."

31.     In her conversations with the District's staff and with Mr. Cook, Ms. Gillings identified four principles to be included in the communication to the students about the impact of the GFI.  These four principles were:

- HPS might consider stating that we should unite against racism by teaching white students how to be allies with people of color.

- HPS might consider stating that we should teach students about white privilege and how it impacts us.

- HPS might consider stating that we should improve our curriculum so that our students have a better understanding of racism and how it impacts us.

- HPS might consider stating that we should make the District a more welcoming place for people of color.

32.     On June 3rd, Ms. Gillings sent Mr. Cook an email with some ideas that she thought should be included in the letter.  Ms. Gillings said:

> I think we need to approach this subject with the idea that we will find ways to teach our students how to be allies with people of color. By that I mean we stand together with people who are being mistreated or oppressed. This is a risk that people have to take (and I say people, because I'm not just talking about kids) in order to make a statement and say that we are not going to allow this type of abuse to continue to happen. I think our statement has to acknowledge that we have areas that we need to grow and learn, because I still think that many of us do not have a full understanding of white privilege and how that comes across to other people. We need to acknowledge that there is work to be done in our curriculum, professional development to gain a better understanding of racism, and our continued efforts to engage in these conversations to make people feel more welcome and at home in Haslett Public Schools. I don't want our letter to just say we are working on an Equity Plan, because let's be honest.....that is only the beginning and it's not going to "correct" the problem, nor will it make people feel at ease.

8

33.     On June 3rd, Ms. Gillings arrived at the School Administration Building and met with Mr. Cook.  Mr. Cook showed Ms. Gillings a proposed draft of a communication that did not contain any of Ms. Gillings' suggestions and appeared to be dismissive of the entire GFI and its aftermath.

34.     Mr. Cook ignored what Ms. Gillings suggested. Mr. Cook sent out to the District's students/parents and staff this letter on June 3rd:

> Dear Haslett Families and Staff,
>
> As our students and their families process the events that have occurred across our nation this past week, we have been thinking about the effect these tragedies may be having on our school community. Due to the fact our schools are closed because of Covid-19, we are unable to directly guide our students during these difficult times and listen to their concerns.
>
> Sadly, we are not able to provide in-person support for students who may be hurting. However, just because we are not together, it does not mean we are not available for you and your children. We acknowledge the injustices that have occurred and want you to know if you are in need, please take advantage of available supports.
>
> Our K-12 Crisis Team was activated to address special student needs when our district was directed to close for in-person instruction. This Crisis Team is available to meet the needs of our families. Please contact your building principal or child's teacher if your family needs this support. Our counselors and professional staff are also here to listen and provide referrals, if necessary.
>
> Haslett Public Schools has always supported a community of caring where diversity and an appreciation of others is an important part of our curriculum. The district continues to prioritize and support equity initiatives. As a district, we acknowledge there is work to be done, and we need to continue efforts to engage staff and families in difficult conversations to ensure everyone feels more welcome and at home.
>
> This fall, our district plans to bring together a group of diverse individuals from the community to examine and analyze appropriate curriculum to gain a better understanding of the intolerance we are facing in our country. We care about and love our students, and we want you to know we are here.

Steven L. Cook Superintendent of Schools.

35.     On June 5th, Mr. Cook asked Ms. Gillings to read an email from Amber Dale.  The email was critical of the District's communication from June 3.  Ms. Dale was upset that the District failed to address any of the important issues, stating that "we would have been better off not sending anything than make the situation seem generic."

36.      Mr. Cook asked Ms. Gillings how he should respond to Ms. Dale. Ms. Gillings told Mr. Cook that "it would be best to be honest and own the fact that we didn't do or say enough regarding our position on the situation."  Mr. Cook stated he would not do that.

### The Superintendent Turns on Ms. Gillings because of Her Advocacy for the District to Support of African American Student Protests

37.     On Monday, June 8th, Mr. Cook approached Ms. Gillings in an aggressive manner stating, "I don't understand why you were upset about the letter that the district sent." Mr. Cook insisted that things "weren't as bad" as people said and said that "I don't think we have a problem in Haslett."

38.     Mr. Cook told Ms. Gillings that he thought the GFI and its aftermath was "all political" and that "people were overreacting."

39.     When Ms. Gillings pointed out that he completely ignored her recommendations for the communication, Mr. Cook tried to justify his dismissive attitude toward her by stating, "Susan, you have been out for a while and everyone else has had to do your work and this has been challenging."

40.     When Ms. Gillings asked him to explain what he meant by the statement "everyone has had to do your work", he repeated the same insult.  Ms. Gillings then stated

that "if because my son died, that means I don't have an opinion…..and I am really sorry that my son died and other people had to pick up the extra work, but that is what a team does."

41.     On June 9th, Ms. Gillings met with Mr. Cook and he repeated his opinion that "I don't think it is as big of an issue as people were making out to be." Ms. Gillings replied by stating "it shouldn't matter if we have one black student or two hundred, the issue was still important and needed to be addressed."

42.     Later that day, Ms. Gillings spoke to Ms. Dale about her concerns about the letter and assured her that the District would write a new one.  Ms. Dale was very supportive and said she was willing to help in any capacity.

43.     Initially, Mr. Cook would not commit to sending a corrective letter, but after several conversations with Administrators in the district, he finally agreed.

44.     The initial draft would be constructed by the Administrative Team, as this team was readily available to meet. The Administrators did not want to delay the communication as it was urgent to get this stronger, more supportive communication out to our families and staff.

45.     Ms. Gillings scheduled a meeting for June 10th.  The High School Administrative Team started a draft copy of a new letter which was shared with the rest of the District's Administrators to help prepare for the meeting.

46.     On June 10th, the District's Administrative Team met and drafted a second letter, which they called an Action Plan.  The Action Plan was designed to address the GFI principles at issue.  The Action Plan was shared with the District's Crisis Team for its feedback and suggestions.

11

47.     On June 11th, Ms. Gillings reached out to a retained Equity and Inclusion consultant from Michigan State University, Dr. Flennaugh.  Dr. Flennaugh reviewed the Action Plan and provided vital feedback.

48.     Between the initial drafting on June 10th and the final draft meeting on June 12th, Mr. Cook met with the male administrators on the team to let them know that if they "weren't comfortable with signing the letter" they were not under any obligation.  Only one administrator opted out of signing the letter.

49.     On June 12th Ms. Gillings met with the majority of the District's Administrative Team and discussed the feedback from Dr. Flennaugh and developed a final version of the Action Plan.

50.     During the discussion, Steven Cook was very quiet and appeared to be sulking. About 20 minutes after the meeting concluded, Mr. Cook called Ms. Gillings and said he wanted to change some things in the letter because he didn't want to "upset the community."

51.      Ms. Gillings noted that she was uncomfortable with making changes to the document, since all team members were signing the letter.

52.     Mr. Cook reconvened the team and they discussed his concerns, adjusted the Action Plan to avoid "upsetting the community" and sent the letter.

**District Administrators Override the Superintendent's View that the Student Protests was "All Political."**

53.     The June 12th final Action Plan stated:

Dear Haslett Families and Staff,

We are living through difficult times marked by anger, frustration, and hurt at the racial injustice in our country, most recently the deaths of George Floyd, Breonna Taylor, and Ahmaud Arbery. Haslett Public Schools roundly condemns the senseless deaths of and violence toward Black Americans and the systemic racism that has led to longstanding

inequities.

An important mission of public education is to bring people together to create a better world, one that is more inclusive, just, and equitable. It is more important than ever to teach our children what has brought us to this place as well as about how to work for change. We must promote kindness, understanding, and unity. We must confront our blind spots and discomfort so that we can move forward to create a better, more welcoming school and community. On this journey, Haslett Public Schools commits to the following:

- Elevating Black voices, intentionally shifting focus from white experience in district practices.

- Teaching all students about the legacy of racism and discrimination in our country and the importance of being an ally for racially marginalized communities.

- Broadening our examination of curriculum across grade levels to ensure students of color are represented in genuine and relevant ways.

- Establishing a robust Restorative Practices System, involving all staff, as an alternative to exclusionary discipline, which disproportionately affects students of color.

- Continuing to support our active Black Student Union, exploring opportunities for expansion, listening to feedback, and taking intentional steps to create solutions.

- Expanding professional development opportunities for our staff on implicit bias, social justice, and ensuring equitable practices.

- Continuing our work with the Michigan Department of Education African American Student Initiative to further our examination of guiding principles of cultural proficiency, systems of oppression, unconscious bias, and strategies for changing school culture.

- Being intentional about our hiring practices, recruiting and retaining teachers who mirror our district demographics.

- Establishing both building and district-wide Equity Committees composed of all stakeholders to help guide and provide oversight for our district Equity Plan.

> We understand that the road ahead will be challenging as we endeavor to create a school and system that is more equitable and inclusive. Though there is no easy solution, we are dedicated and committed to doing the difficult work. We welcome your voices and lived experiences as we move forward together.
>
> Sincerely,
>
> Steven L. Cook, Superintendent, Susan P. Gillings, Associate Superintendent and the Administrative Team

54.    On June 18th, HPS received a letter addressed to Steve Cook and the Board of

Education from a group of alumni and current students calling themselves the Haslett Voices

for Change ("HVC").  The HVC was concerned about the Action Plan that was sent out by the

District and the racial inequality that they experienced while students in the District.

55.    The letter stated in relevant part:

> Dear Steven Cook, Members of the Haslett Public Schools Board of Education, and Principals: Haslett's Black, Indigenous, and Students of Color Matter.
>
> We are Haslett Public Schools (HPS) alumni and are responding to the email that was sent to the Haslett community. We greatly appreciate this email, but we think more needs to be done. Being able to send an email about the steps you are taking is an acknowledgement of privilege and the power you have to change the culture of the district and develop future leaders. We write to respectfully insist that HPS: (i) craft a comprehensive Elementary, Middle and High School curricula plan inclusive of BIPOC history and specifically addressing systemic racism and White privilege; (ii) require diversity and inclusion training for all staff and students (iii) hold staff and students accountable for their racist actions….
>
> Accordingly, we believe it is necessary for HPS to create a comprehensive plan for addressing these issues at the Elementary, Middle and High School levels. It is imperative that we take responsibility for ensuring that our students don't learn about these issues through hashtags or social media……The curriculum should do this while highlighting differences between active engagement against the racist structures our society is founded on, and complicit white fragility and performative activism. Haslett Public Schools must ensure that these conversations are not optional, which could lead to students of color once again bearing the

14

burden of having these difficult discussions while white students opt out. The district must undertake these discussions with a self-critical eye, fostering conversations about how predominantly white institutions like HPS itself, and public school systems like it, perpetuate racist policies -- even if it does not intend to do so.

Further, diversity and inclusion continuous education should be provided for all staff. We acknowledge that HPS has been actively participating in diversity and inclusion initiatives in the past few years. However, we also acknowledge that racism continues to pervade HPS and beyond. We encourage you to release an evaluation of the diversity and inclusion initiatives as we move forward. Learning never ends for any of us when it comes to these topics. .....

**As students, we have witnessed blatant racism coming from the staff and other students on many occasions.** For example, students have transferred schools due to racist accusations as well racist actions from students, Black male students report being reprimanded at a higher rate than their white counterparts, people who are raising kids of color purposely avoid sending their children to Haslett so they don't experience racism. Conversely, Black students report that hearing their non Black counterparts say the n-word is not uncommon, while this behavior is often left unchecked. Rather than merely suspending students and leaving staff unchecked if they say a racist remark or engage in racist actions, they should attend a mandatory implicit bias training, in order to further promote the idea of "a robust Restorative Practices System". Race-based aggression and insensitivity should be met with a set of consequences mirroring the academic integrity policy, and face a similar marking on a student transcript. Racism has much larger implications in a professional atmosphere than cheating on a test…….

Sincerely,

**Haslett's Voice for Change**
   Sophie Busch, Class of 2019
   Jacquelyn Duckett, Class of 2018
   MeKayla Ford, Class of 2019
   Vongaishe Mutatu, Class of 2019
   Zoi Crampton, Class of 2019
   Farai Mutatu, Class of 2018
   Precious Henries, Class of 2020
   Sophia Brittain, Class of 2021

56.     From June 9th until July 1st, Mr. Cook barely spoke to Ms. Gillings. Mr. Cook would have other people ask Ms. Gillings to perform tasks or he would send her an email.

57.     On Saturday, July 11th, HVC organized a rally at the High school.  About 30 alumni and current students, along with some supportive parents and teachers attended the rally. Principal Brandy Butcher and Associate Superintendent Susan Gillings attended to support the students but also to be present in case they had any issues from neighbors or other people.   The students walked the block several times, carrying signs with BLM messages and statements.   Everything they did was very peaceful, appropriate and meaningful.

58.     Students reported to Ms. Gillings that a handful of community members who passed by this demonstration in their cars yelled racial slurs at the students and told them to go back to their own country.

### The Protests Reveal that African American Students in the District are Routinely Abused by their White Peers

59.     On July 15th, the District's Administrative Team, Board members Cammy Wheeler and Tammy Lemmer, Dr. Terry Flennaugh, and the HVC student/alumni group met to discuss results of a survey that they initiated from former and current Haslett students.

60.     The results of the Survey were disturbing: There were 124 responses (93 whites, 22 blacks, 14 Hispanics and 8 Asians) to the survey. 71% had witnessed racial inequity or racial issues and included comments such as:

> **Survey Results- "What racial problems would you like to see addressed at Haslett Public Schools?"**
>
> "Accountability for those who use derogatory phrases and racial slurs, so everyone feels more welcome."

"Stopping racial slurs, people need to get punished, racial profiling by students and STAFF/teachers, I saw it way too many times."

"Problems such as calling someone a racial slur, making fun of another race."

"Racial slurs, categorization of POC, and condescending views from wealthier white kids"

"Acknowledge that there are several racial problems in our school and create a system that       will punish students when one is addressed. In addition, include a more diverse staff so students feel comfortable reaching out to another teacher, if they don't already."

"The use of the N word and people need to be better educated on black history and the importance of making change."

 "Exposure to non-white cultures"

"None of the teachers do anything if they see or are told that a student is experiencing racism. I also feel that all students and faculty should go through implicit bias courses and learn more about African American and Latino history in the USA."

 "A focus on content of character, NOT color of skin."

"The common use of racial slang: students should be taught and know not only that it's not ok to put down other using this slang, but it's also not ok to use it in casual conversation. Not only students should be held accountable for this, but teachers and staff too."

"Racial jokes are constantly made at Haslett as well as just a separation between white students from students of color...it's hard to find acceptance among peers"

"Having a consistent way of determining how to discipline students or faculty if instances of racism occurred."

61.    The information was very well presented to Mr. Cook and the HPS Administrators. The results of the survey were very difficult to accept because it revealed that the minority students at HPS have been for a long time subjected to unconscionable racial communications and conduct.

17

62.    Collectively, the Administrative Team was appalled and upset that these racially charged incidents were reported as so widespread.  The problem of uncontrolled racism was compounded by the fact that the students did not feel comfortable stepping forward to complain.

### As a Result of the GFI Protests and the Survey Revelations, Efforts are Made to Reform the District's Curriculum Leading to Another Attack on Ms. Gillings because of  Her Advocacy

63.    On September 23rd, the Board of Education ("BOE") Finance/Facilities Committee held a Meeting-Discussion on Policy Changes related to the HVC requests.  This committee included Steven Cook, Susan Gillings, Rick Jensen, Greg Michaud, Tracy Collins, and Karen East.

64.    During this meeting, Board Trustee Greg Michaud ("Mr. Michaud") again raised concerns about the requested changes for Policy 2210 (Curriculum Development) from HVC group.

65.    The intent of the Committee Meeting on September 23rd was to share the proposed changes so that the Administration could put them through the three-reading process at the BOE meetings and then approve the language.

66.    The proposed changes to Policy 2210 were to provide grade appropriate instruction on respect for cultural differences, understanding unconscious bias and micro-aggressions as pivotal life skills, and to consider more professional development related to diversity and inclusion.

67.    Mr. Michaud repeatedly kept insisting that the District should survey the community to see if they were in support of the language changes.

18

68.     Ms. Gillings considered this to be a biased delay tactic on the part of Mr. Michaud who repeatedly opposed these changes.

69.     Like Mr. Cook, Mr. Michaud would suggest that the protests in the wake of the GFI lacked sincerity and authenticity because he would state publicly they were "all political" and an "overreaction" to George Floyd's murder.

70.     Ms. Gillings strongly resisted Mr. Michaud's suggestion and said that she refused to allow a community survey to derail these changes, reminding him that the survey results that had been presented to Mr. Cook and the Administrators were so disturbing that the need for change was now imperative.

71.     Ms. Gillings also said that if HPS opened these policy changes to community debate, District students deserved to be heard as part of the debate.

72.     Karen East was a vocal supporter of Ms. Gillings' position and Tracy Collins agreed as well.  Rick Jensen and Steven Cook remained silent on the issue.

73.     After the meeting, Mr. Michaud approached Ms. Gillings and said he did not mean to upset her and that he understood that she was passionate about the topic and he was not trying to say he did not support the policy changes.

74.     Ms. Gillings indicated that tomorrow is a new day, and she would move forward, but she was not willing to go back to the status quo.  She told Mr. Michaud: "I believe in this movement and I will most definitely support it."

75.     About 20 minutes after the meeting adjourned, flowers were delivered to Ms. Gillings' office from Mr. Michaud.

### Ms. Gillings Advocates for Teacher Safety During the Pandemic and Experiences More Retaliation.

76.     On October 14th, Ms. Gillings met with members of the Teacher's Union and Administration and BOE members including Mr. Michaud. The meeting was focused on the HPS Return to School Plan.

77.     Parents were becoming very vocal about returning their children to the classroom.  The BOE was yielding to parental pressures while the teachers were resisting because of safety concerns.

78.     At various times during the meeting, Ms. Gillings supported the arguments made by the teachers and reiterated that the Board of Education was made aware of these concerns during several previous meetings.

79.     On October 16th, Ms. Gillings met with Mr. Cook who told her that he had an hour-long conversation with Greg Michaud the night before.

80.     Mr. Cook told Ms. Gillings that Mr. Michaud said that she was "unprofessional" during the October 14th meeting.  Mr. Michaud said that it was "unprofessional" for Ms. Gillings to support the teachers' arguments about safety.

81.     Mr. Michaud contended that Ms. Gillings should have voiced her support for the teachers behind closed doors so that Administration would appear unified in its position on the return to classroom instruction issues.

82.     Mr. Cook told Ms. Gillings to remember that she works for the BOE and it was wrong for her to be siding with the teachers.

83.     Mr. Cook said that this was a huge issue of concern for Mr. Michaud.  Ms. Gillings told Mr. Cook it was important for her to advocate for staff, students, and families and was willing to put her job at risk, if necessary.

84.     Mr. Cook replied by saying, "you've said a few times that you don't care if you get fired and Susan, you don't want to go down that road."  Ms. Gillings said "yes, but I've said that in the context of if they fire me it's because I am doing the right thing for kids or staff, then so be it."

85.     Ms. Gillings reminded Mr. Cook that Mr. Michaud was the same person that clearly did not want the District to do the racial justice work that the Administration was doing and that she was the only person that stood up to Mr. Michaud on the racial equity issues.

### Ms. Gillings Has Mental Breakdown Over the Hostile, Demeaning and Intimidating Work Environment and Goes on Family Medical Leave of Absence

86.     Ms. Gillings became very emotional over the encounter with Mr. Cook and indirectly Mr. Michaud. She called her treating physician, and she was placed a 90-day Family Medical Leave starting immediately.

87.     On December 18th, Ms. Gillings met with Steve Cook to talk about her plans once her leave was up in mid-January, 2021.  Ms. Gillings was encouraged to use some of her leave time for a vacation.  Ms. Gillings and Mr. Cook discussed activities at the District.  Mr. Cook stated, "let's meet when you get back from vacation to see where you are at."

88.     On December 30th, Ms. Gillings met with Mr. Cook to further discuss her return-to-work plans.  Mr. Cook filled her in on where things stood with the District. Ms. Gillings said she planned to return to work on January 11, 2021.

### Superintendent Cook Uses Various Unconscionable Tactics to Get Ms. Gillings to Quit

89.     Mr. Cook appeared shocked upon hearing of Ms. Gillings' plan to return to work on January 11th.  Mr. Cook began to come up with reasons for her not to return to work,

including that it would be best for her health if she did not return to work and pointed out how things were so stressful and that he was very  worried about her.

90.     When this paternalistic tactic failed, Mr. Cook brought up for the first time a "harassment letter" that "would need to be dealt with."

91.     Ms. Gillings was clueless about the "harassment letter".  Ms. Gillings asked him what he was referring to.   Mr. Cook said Steve Kioski, Custodial Supervisor at HPS, had submitted a complaint dated October 2, 2020 about the "heated" meeting that happened on September 22, 2020.

92.      Ms. Gilling said she remembered the meeting and it became heated because Mr. Kioski was being grossly insubordinate and "he was constantly lying about never being asked/told or where things were."  Ms. Gillings pointed out there have been many "heated" discussions about Mr. Kioski not doing his job with Billy Hastings, Director of Facilities and Operations and Bart Wegenke, Haslett High School Principal (now deceased) Both were male supervisors, and there was never a complaint.

93.     Ms. Gillings said "It's because I'm a female.  If I was a white male, he wouldn't have said a word."  Ms. Gillings also said, "It's just like the Greg Michaud issue.  If I was a white male and said those same things in that same tone/context, he would have never said a word.  But since I am a female, I'm 'unprofessional' and I should just shut up and do what I'm told."

94.     Ms. Gillings asked for a copy of the harassment letter. Mr. Cook said he would contact the District's attorney Rob Dietzel to see if she could have a copy.

95.     At the end of this conversation, Mr. Cook again suggested that Ms. Gillings might want to consider not returning to work. Mr. Cook mentioned that he had checked how

many personal and sick days she had left and told her that it would take her to the end of March.  Mr. Cook even went so far as to say that he was willing to help her find a job elsewhere, that he would give her a good recommendation, and he would make sure she was getting paid for a few months until she secured a new position.

96.    Mr. Cook said to Ms. Gillings "if you aren't coming back, I want to post your job right away."  Mr. Cook then said, "let's meet in a week and see where you are at."

97.    On January 4th, Ms. Gillings texted Mr. Cook and asked for a copy of her new Administrator contract, since they had just received final approval from the BOE, and again asked for a copy of the harassment letter.  Mr. Cook responded by stating the contracts were not "new" and the Board just approved the $2300 off schedule payment for all administrators.  He also said he "will check and see if I can share the harassment letter."

98.    On January 5th, Ms. Gillings met with Mr. Cook to continue the discussion about her return-to-work plans. Mr. Cook said he hadn't heard back from Mr. Dietzel about sharing the harassment letter, so Ms. Gillings asked him to tell me what it said.

99.    Mr. Cook retrieved the letter and started to talk, then got up from his desk and handed her the letter and said "don't tell anyone I showed you this".  Ms. Gillings read the letter and then reiterated what she had said at the meeting on December 30th, "if I was a man, this would have never been written."  Ms. Gillings returned the letter to Mr. Cook.

100.    Finally, after an extended conversation that resulted in Ms. Gillings becoming emotional, she said to Mr. Cook "you are trying to push me out the door."  Mr. Cook continued to talk to her about her taking "more time to think about your decision to come back" and Ms. Gillings kept saying "I didn't need more time."

23

101.    On January 7th, Mr. Cook sent to Ms. Gillings a Separation of Employment proposal.

102.    On January 8th, Ms. Gillings met with Mr. Cook to review the document.

103.    On January 23rd, Ms. Gillings emailed Steve Cook to request a copy of the harassment letter that was first mentioned on December 30th. Mr. Cook advised Ms. Gillings to secure the letter from Mr. Dietzel. Ms. Gillings asked Mr. Dietzel for the letter that day.

104.    On February 1st, Mr. Dietzel emailed the harassment letter to Ms. Gillings' counsel.

105.    On February 8th, counsel for Ms. Gillings informed Mr. Dietzel that she would not accept the Separation Offer and planned to return to work.

106.    On February 10th, Mr. Dietzel received from Ms. Gillings' counsel a return-to-work release prepared by Ms. Gillings' physician permitting her to return to work immediately.

107.    On February 16th, HPS acknowledged that Ms. Gillings was authorized to return to work but denied her the right to return to work by placing her on paid administrative leave pending investigation into the complaint about an event occurring on September 22, 2020, written up on October 2, 2020 and disclosed to Ms. Gillings for the first time on December 30, 2020.

108.    On March 1, 2021, Ms. Gillings protested the retaliatory treatment she was experiencing by asserting through her counsel that the adverse action taken against her was in retaliation for her exercising her First Amendment right to advocate for racial equity and her federally protected right to be from retaliation because she advocated for the rights of racial minorities.

24

109.    Rather than address her protest that her constitutional and statutory rights were being violated, Mr. Cook ordered that Ms. Gillings' complaints be ignored.

110.    In further retaliation for her exercising of her constitutional and statutory rights to advocate for equity, diversity, and inclusion for racial minorities in the school district and in retaliation for her March 1 protest, Mr. Cook issued to Ms. Gillings at 5:00pm ET on March 18, 2021 an arbitrary and capricious Recommendation for Non-Renewal of her Administrators contract.

111.    Ms. Gillings was non-renewed on April 26, 2021 thereby ending her employment with the District.

### COUNT I
### Violation of 42 U.S.C.§1981-Retaliation for Advocating for the
### Rights of African Americans
### *Gillings v HPS*

112.    Plaintiff incorporates the above allegation by reference.

113.    42 U.S.C. § 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

114.    The Sixth Circuit Court of Appeals has stated that a White high-level school official could bring a claim under § 1981 for discrimination based upon her advocacy on behalf of minorities because the discrimination would be "because of such individual's race," where the race of the minorities for which she was advocating would be "imputed" to the high level school official. *Johnson v University of Cincinnati*, 215 F. 3d 561,575 (6th Cir.2000).

25

115.   Ms. Gillings was subjected to a retaliatory hostile, demeaning   and intimidating work environment because of her advocacy of minority students.

116.   This hostile and intimidating environment was deliberate in that the Superintendent and at least one member of the Board of Education harassed, insulted and defamed Ms. Gillings in an effort to get her to quit.

117.   Instead of quitting, Ms. Gillings elected to take an extended FML.  While on her leave, the Superintendent continued his campaign to get her to quit by employing several tactics including appealing to her vulnerability because of the natural emotion surrounding her deceased son and offering her a wholly inadequate severance agreement.

118.   When those tactics failed and Ms. Gillings announced her intention to return to work, the Superintendent continued the harassment by prohibiting her return to work based on the pretext of a frivolous complaint about a heated discussion she had five months earlier and a later suggestion made to others that if she did not take the severance she could be terminated for cause or subjected to an arbitrary non-renewal of her Administrator's contract.

119.   The Superintendent issued a recommendation of Non-Renewal on March 18, 2021 Defendants issued the non-renewal of Ms. Gillings' contract on April 26, 2021, effectively ending her performance despite her record of exemplary performance.

120.   Ms. Gillings has suffered and will continue to suffer economic losses and extreme emotional distress because of the retaliatory hostile, demeaning and intimidating work environment, was deprived of her right to return to work after being cleared from an extended FML and denied continuing employment by a retaliatory decision to non-renew her contract.

## COUNT II
### Violation of 42 U.S.C § 1983-Retaliation for asserting First Amendment Right to Free Speech and to Petition the Government
### *Gillings v HPS and Cook*

121.    Plaintiff incorporates the above allegations as though stated in full herein.

122.    As a public employee, Ms. Gillings enjoyed protection against retaliation for exercising her right as a citizen to Free Speech and to Petition her government for a change in policies.

123.    Ms. Gillings engaged in constitutionally protected speech and conduct because her speech and conduct addressed a matter of public concern.

124.    How African Americans have been treated historically and how they should be treated in the future considering the GFI and similar movements is a matter of public concern as is the right of teachers to enjoy a safe workplace during the Covid Pandemic.

125.    Allegations of racial discrimination, discriminatory educational and teacher safety policies are the types of statements that demand strong First Amendment protections.

126.    Ms. Gillings spoke as a parent of bi-racial children and as a citizen because her speech and conduct was not ordinarily within the scope of her duties and is therefore protected. *Lane v Franks,* 573 U.S. 228,240-241(2014).

127.    Ms. Gillings experienced retaliation from Defendants for the exercise of her First Amendment Rights including being subjected to a retaliatory hostile, demeaning and intimidating work environment leading to extreme emotional distress, pushing her to resign her employment, experiencing defamation and the District's refusal to allow her to return to work from a stress leave.

128.    The above adverse employment action would deter a person of ordinary firmness from continuing to engage in that speech or conduct.

27

129.    The protected speech was a substantial or motivating factor for the adverse employment actions alleged in this Complaint.

130.    The constitutional violations asserted here were carried out as official policy of the HPS or carried out by the Mr. Cook the highest authority within HPS.

131.    Mr. Cook is not entitled to qualified immunity because he knew his conduct violated clearly established constitutional law protecting public employees who exercise their protected First Amendment Rights.

132.    This hostile, demeaning and intimidating environment was deliberate in that Mr. Cook and at least one member of the Board of Education harassed, insulted and defamed Ms. Gillings in an effort to get her to quit.

133.    Instead of quitting, Ms. Gillings elected to take an extended FML. While on her leave, the Superintendent continued his campaign to get her to quit by employing several tactics including appealing to her vulnerability because of the natural emotion surrounding her deceased son and offering her a wholly inadequate severance agreement.

134.    When those tactics failed and Ms. Gillings announced her intention to return to work, Mr. Cook continued the harassment by prohibiting her return to work based on the pretext of a frivolous complaint about a heated discussion she had five months earlier and a suggestion made to others that if she did not take the severance she could be terminated for cause or subjected to an arbitrary non-renewal of her Administrator's contract.

135.    The use of the stale complaint from the insubordinate employee constituted a form of gender bias because similarly situated male administrators who used strong language in addressing employee misconduct were not criticized or disciplined. Ms. Gillings'

utilization of psychiatric services caused Defendants to regard her as "broken" and not longer to carry out the demanding duties of Associate Superintendent.

136. Defendants continued the harassment and retaliation by non-renewing Ms. Gillings' contract with the District, thereby ending her employment, despite her exemplary performance record.

137. Ms. Gillings has suffered and will continue to suffer economic losses and extreme emotional distress because of the retaliatory hostile and intimidating work environment, being deprived of her right to return to work after being cleared from an extended FML and non-renewal of her contract.

**COUNT III – FMLA RETALIATON**

138. Plaintiff incorporates the above allegations as though fully stated herein.

139. Defendants, Cook and HPS, are employers within the meaning of the FMLA because they employed 50 or more employees during the relevant time period.

140. At all times relevant to this action, Ms. Gillings was an eligible employee under the FMLA because she worked for at least 12 months for the District and in excess of 1,250 hours during the twelve months immediately preceding the date on which she took approved FMLA leave.

141. Defendants are prohibited under the FMLA from retaliating against Plaintiff for requesting and/or taking FMLA leave.

142. When Ms. Gillings attempted to return to work following her approved FMLA leave, Defendants refused to allow her to return to work.

143.    Defendants used the pretext of a heated discussion that Ms. Gillings had with a subordinate employee five months earlier in which she was questioning his performance to prevent her return to work from her approved FMLA leave.

144.    Following her FMLA leave, Defendants non-renewed Ms. Gillings' contract with the District and ending her employment in retaliation for her exercise of her FMLA rights.

145.    As a result of Defendants' retaliatory actions, Ms. Gillings has lost wages, employment benefits and other compensation and incurred expenses.

**COUNT IV – ELCRA – GENDER DISCRIMINATION**

146.    Plaintiff incorporates the above allegations as though fully stated herein.

147.    The ELCRA prohibits employers from discriminating in the terms and conditions of employment on the basis of gender. MCL 37.2202.

148.    At all relevant times, Plaintiff was an employee and Defendants were employers within the meaning of ELCRA. MCL 37.2201.

149.    Defendants refused to allow Plaintiff to return from approved medical leave, placed her on paid administrative leave and terminated her employment by non-renewing her contract allegedly due to a heated discussion with a subordinate employee regarding his non-performance of his duties.

150.    Male supervisors who engaged in heated discussions with this same individual regarding performance of his job were not disciplined or terminated from their positions by Defendants.

151.    Defendants used the heated discussion as a pretext to terminate Plaintiff from her position because of her gender in violation of ECLRA.

152.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer lost wages and other economic advantages of employment as well as emotion distress, humiliation, embarrassment and loss of status in her chosen profession.

**COUNT V – PDCRA**

153.   Plaintiff incorporates the above allegations as though fully stated herein.

154.   At all relevant times, Plaintiff was an employee and Defendants were employers within the meaning of Michigan's Persons with Disabilities Civil Rights Act, MCL 37.1101 et seq.

155.   The PDCRA makes it unlawful for an employer to discriminate against a qualified individual because the individual has a disability, a record of a disability or because the employer regards the individual as disabled.

156.   Following the death of her son, Defendants regarded the Plaintiff as mentally disabled, telling her that it would be best for her health if she did return to work.

157.   Because Defendants regarded Plaintiff as disabled, they refused to allow her to return to work following an approved FMLA leave and then ended her employment with the District by non-renewing her contract.

158.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer lost wages and other economic advantages of employment; Plaintiff has and will continue to suffered mental anguish, humiliation, embarrassment, emotional distress and loss of status in her chosen profession.

**Relief Requested**

Ms. Gillings requests the following relief:

a.      An Order of the Court reinstating her to her position as Associate Superintendent.

b.      An Order of the Court awarding Ms. Gillings compensatory and punitive damages for the willful violation of her constitutional rights by Mr. Cook.

c.      An Order of the Court awarding Ms. Gillings actual and reasonable attorney fees and litigation costs.

d.      An Order of the Court awarding Ms. Gillings liquidated damages as a result of Defendants' violation of the FMLA.

e.      An Order of the Court for such other Relief the Court deems just and equitable.

Respectfully submitted,

Pitt, McGehee, Palmer, Bonanni & Rivers, PC

By:*/s/ Michael L. Pitt*____
Michael L.  Pitt (P24429)
Beth Rivers (P33614)
Attorneys for Plaintiff
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9900
mpitt@pittlawpc.com
brivers@pittlawpc.com

Dated:  September 10, 2021

32

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

Susan Gillings,

        Plaintiff,                Case No. 1: 21-cv-264
                                        Hon. Hala J. Jarbou

        v.

Haslett Public Schools and
Steven L. Cook in his individual
and official capacities,

        Defendant.

_____/

| | |
|---|---|
| Michael L.  Pitt (P24429) | Timothy J. Mullins (P28021) |
| Beth Rivers (P33614) | Giarmarco, Mullins & Horton, P.C. |
| Pitt, McGehee, Palmer Bonanni & Rivers, PC | *Attorney for Defendants* |
| Attorneys for Plaintiff | 101 W. Big Beaver Road, 10th Floor |
| 117 West Fourth Street, Suite 200 | Troy, MI 48084-5280 |
| Royal Oak, Michigan 48067 | (248) 457-7020 |
| (248) 398-9800 | tmullins@gmhlaw.com |
| mpitt@pittlawpc.com | |
| brivers@pittlawpc.com | |

_____/

### **DEMAND FOR JURY BY TRIAL**

        Plaintiff, by and through her attorneys, Pitt McGehee Palmer Bonanni & Rivers, P.C.,

hereby demands a trial by jury of all issues in the within cause of action.

                        Respectfully submitted,

                        Pitt, McGehee, Palmer, Bonanni & Rivers, PC

                        By:*/s/ Michael L. Pitt_____*
                        Michael L.  Pitt (P24429)
                        Beth Rivers (P33614)
                        Attorneys for Plaintiff
                        117 West Fourth Street, Suite 200
                        Royal Oak, Michigan 48067
                        (248) 398-9800
                        mpitt@pittlawpc.com
                        brivers@pittlawpc.com

Dated:  September 10, 2021